The United States Court of Appeals for the Ninth Circuit is now in session. Thank you. You may be seated. Good afternoon and welcome to all of you. Welcome to the James Browning Courthouse here in San Francisco. We're all happy to be here. This is the time set for the case of James Huntsman v. the Corporation of the President of the Church of Jesus Christ of Latter-day Saints. If the lawyers are ready to proceed, you may come forward. Good afternoon and may it please the Court, Your Honors. My name is David Janellis and I represent Appellant James Huntsman. Before I begin, may I reserve five minutes for rebuttal? Thank you. I'd like to start, Your Honors, with a quote from a song that I'm sure you all know. When I find myself in times of trouble, Mother Mary comes to me. Speaking words of wisdom, let it be. In most contexts, the name Mother Mary has religious connotations. But here, it's just Sir Paul McCartney singing about his mother, Mary McCartney. It's secular. And the same is true of the word tithing, Your Honors. In many cases, that word would invoke religion. But here, in this narrow case, the implications are no more religious than the song, Let it be. Counsel, how can you say that? I understand the importance of avoiding constitutional questions where we don't need to do that. But, for example, the Supreme Court in Presbyterian Church v. Mary Elizabeth Blue Hall that dealt with a trespass claim. Our Lady of Guadalupe, which dealt with an employment claim. And Kedre v. St. Nicholas Cathedral of Russian Orthodox Church dealt with an incorrect incorporation of secular legal principles to church governance. Why in this case, where we're dealing with tithing, which, if you would agree, is a very common principle among many, many religions. You've seen some of the arguments from opposing counsel, or the amicus counsel, talking about the many differences that there are among religions about the meaning of tithing. But, to my understanding, tithing, unlike your Mother Mary example, is a quintessential religious issue. In fact, I don't know of any use of the term tithing that is not religious in context. What am I missing? Your Honor, you've cited three cases in which the Church's decision-making functions were at issue. For example, in Our Lady of Guadalupe School, as Your Honor noted, that had to do with a decision to hire or fire. It was employment, which is why the ministerial exception applies. What we have here is more similar, Your Honor, to U.S. v. Rashid, wherein this circuit found that even where, and there it wasn't called tithing, but it was still a donation made to the religious organization under a supposed commandment of God, and the organization in that particular instance had not disclosed how the money was being used truthfully, and this circuit found that that, it doesn't matter that the concept of donation may be cloaked in religion, that's not a way to get away from fraud. And, Your Honor, this is a fraud case, a simple fraud case for which the First Amendment provides no sanctuary. And, frankly, that's why every single judge that's looked at this case so far has reached the same conclusion with respect to the First Amendment, even where they may have staunchly disagreed on other issues. And to this point, Your Honor, I'd like to spend my limited time here today addressing three points. First, the secular nature of this dispute. Second, inferences that must be drawn in Mr. Huntsman's favor. And third, the slippery slope. And I also understand that the panel has requested that we be prepared to discuss domicile, and should the panel have questions, I'm happy to address them to you. You may be going to address this, but I hope you will. Your claim sounds under California tort law for fraud, and one of the elements of that, of course, you know, is justifiable reliance. I'd be interested to know, wouldn't you be asking a jury to determine whether Mr. Huntsman's reliance was justifiable? And in order to do that, wouldn't you have to understand what a reasonable church member would know, which would get you into the religious context? At some point, will you answer that question, please? I'm happy, Judge Smith, to answer that question now. With respect to the issue of reliance, and again, this gets me to preview my second issue of inferences, we have Mr. Huntsman's sworn testimony on pages 44 to 45 of the record, unequivocally that he relied on the church's statement that the money for City Creek was coming from somewhere other than tithing. In fact, the church on one instance at least went so far as to say not one penny of tithing was used. And Mr. Huntsman has stated unequivocally that that mattered to him, it was material, and that that impacted his decision to donate tithing. It still has to be reasonable reliance, right? That's the test under state law. So he may subjectively believe that, but we would then have to ask, or a jury would have to ask, is that reasonable? That's correct, Your Honor. At that point, sorry to cut you off, but the question would be, how is that not essentially weighing his belief that he gave tithed monies as a condition for something and the church's view that tithed money is a required commandment? Because, Your Honor, in the context of the reliance here, Judge Bress, it's a secular issue. It's one of accounting, and that's the fundamental way we would submit that this case has been misframed by the church, respectfully. Yes, tithing is a religious doctrine, a commandment from God, as the church would have it be known. However, to address tithing in the context of this case with the facts at bar, we don't need to look at any commandment. We need to look at the church's own secular definition of tithing, which at the record, it's 682. And just to pause you, how can a church have a secular definition of a religious obligation? I don't understand how that could be. Because it's not about the reasons for giving tithing in general. It's the reasons for giving the tithing in this particular instance. Again, it's a very— Counsel, let me follow up on that because I'm really struggling to understand how this case would be tried without really delving into not only the church's view of what its doctrines dictate, but Mr. Huntsman's own understanding of tithing and how tithing donations would be utilized. I thought that he had testified at numerous points in his declaration talking about how when he gave the tithing money, there were no conditions put on it. And the reason was that as a longtime church member, he had a very firm understanding of what tithing really meant. And all of that understanding really stemmed from church doctrine or his understanding of church doctrine. So I take it that your argument really tries to narrow the trial on the few statements that were at issue in this case. But if this case were to go to trial, wouldn't the church be entitled to pull the lens back and talk about tithing, the purposes of tithing in general? They would be able to talk about President Hinckley's statements, not just as narrowly defined as you, but much broader than that. And in response, then Mr. Huntsman would also potentially testify about his own understanding of religious doctrine. I just don't see how this case could be tried as narrowly as you're contemplating. Can you respond to that? Of course, Your Honor. And this goes to Judge Ress's question as well. Yes, I was really struggling with the same area that his questions went to. I think we need to respectfully back up for a moment just to talk about this case because you've referenced what the case is about. And let me be clear, lest this has been misframed by the church. Mr. Huntsman in this case does not challenge how the church ultimately chooses to spend its tithing, even if it spends the money on City Creek or on beneficial life. That's the church's prerogative. That's protected, admittedly, under the First Amendment and Fourteenth Amendment, the autonomy doctrine, whatever we want to call it, and completely distinct from the issue here. The issue here is how the church told Mr. Huntsman under its definition of tithing, which, again, is not secular. The church has used general accounting principles to describe the tithing here. If we look at page 682 of the record, the church has stated that tithing, as President Hinckley apparently understood it in 2003 during his general address, was the principle. The money that my client, Mr. Huntsman, took and gave to the church before it was invested anywhere else. Does it matter that the April 2003 speech came from President Hinckley in this religious context? In other words, this wasn't just any old speech. It was given in this broader sense of describing the church activities and religious mission. And isn't there a concern if you're asking courts to start parsing these speeches, whether it's going to chill something within religious doctrine or internal church governance that a church leader might have to run a speech by legal before he can deliver a sermon? No, Your Honor, in respect to that, actually piggybacks very nicely on Judge Bress and Judge Wynn's question. I can answer all these together because the answer would be no more so than the religious statements made in Rashid, no more so than the religious statements made in Maktab Tariq or in Annamalai or in any of the other cases where our Supreme Court or this circuit or other circuits, such as the 11th Circuit in Annamalai or the Court of Appeal in Texas in Libhart, have addressed issues where in the context of a sermon, for example in Rashid, Pastor Rashid told his congregants, it is God's will from the pulpit that you give your money as ministers and it will be quadrupled under the will of God. In that case, just as we would submit in this case, Pastor Rashid knew at the time that he made that statement that it was not actually going to be quadrupled under the will of God. It was going to be quadrupled by all of the other donations that were taken in in what this circuit characterized as a pyramid or Ponzi scheme. In this case, likewise, there is at a bare minimum, Your Honors, a triable issue of fact as to when President Hinckley and Bishop Burton and the Church's official magazine and the Church's statement to Deseret News and Keith B. McMullen's statement to the Salt Lake Tribune, at the time that all of those statements were made on five — About McMullen, don't we have to decide whether or not McMullen can speak for the Church? And isn't that a religious question? No, Your Honor, because at the time that McMullen made the statement, he was speaking on behalf of the Church, and he said that not one penny of tithing was being used. I mean, how do we know he was speaking on behalf of the Church? Your Honor, that would be a question that could be asked in discovery, should this case proceed. Isn't that precisely the problem, though? We're supposed to ask who can speak on behalf of the Church? So what if the Church says, no, he wasn't speaking on behalf of us, and then we're going to decide as a religious matter that he was speaking on behalf of the Church? First of all, Your Honor, the Church has never questioned that issue. In fact, in the record below — But isn't that hypothetical? What would happen in that case? Hypothetically, if he was not speaking upon the Church and if the Church chose to distance itself, which it had the opportunity to do. I mean, that statement was made, as we know, in 2012. This case was filed in 2022. There was ample opportunity for the Church to say no. So what would happen in that case, though? Then we would have to say the Church is wrong, that Keith McMullen actually was speaking on behalf of the Church. The Church would, in your hypothetical, if the Church denied that Mr. McMullen was speaking on behalf of the Church and said no, none of these five individuals were speaking on behalf, and really it was something completely different, even though one of the individuals, President Hinckley, was, according to the Church, speaking on behalf of — But the bottom line is we can say, no, the Church is wrong. Keith McMullen was speaking on behalf of the Church. Based on the record, yes. And in your hypothetical, we'd have to address it in the facts at bar. But the issue — But how is that not, like, deeply entwined with religious matters, then? Because if that was deeply entwined in religious matters, a simple issue of is somebody speaking on behalf of an organization, where would we even draw the line as to what's religious and what's not? So long as linguistics and vernacular are religious, I mean, this gets back to the issue of let it be and tithing, and it shouldn't be — it wouldn't be equitable or consistent with the intent of the First and Fourteenth Amendments and the doctrine stemming, therefore, to say that simply to use this circuit's terminology, simply because you invoke religious terminology, you're now cloaking civil torts in immunity. That's not the purpose. When there are issues here, and this again gets back to the questions, these are accounting issues. The Church — Counsel, with respect, if I understand the record correctly, President Hinckley never said these were accounting issues. Mr. Hudson was a member of the Church for many years, continued to pay well after President Hinckley said what he agreed he said. He says that he understood President Hinckley to say that tithing was treated in two parts. There's the principle that's given, and then the reserve. The Church later showed that it was just the reserve that was being used. You've got four statements after the original statement that he didn't break it down that way. But Mr. Huntsman knows, and the record shows, that unless you want to get into LDS doctrine, which you can't do, President Hinckley is the only person, the only person, who is authorized to speak authoritatively on behalf of the Church. So you say that's not true, but then you get into Church doctrine to say otherwise, do you not? Respectfully, no, you don't, Your Honor. How's that? First of all, Mr. President Hinckley was not the only person to speak on behalf of the Church. And on what do you rely for that? I would say to Presiding Bishop H. David Berkley. The Presiding Bishop of the Church is an inferior officer of the Church. There's only one prophet and president of the Church. Mr. Huntsman's record indicates that. He speaks for the Church, nobody else. So how do you say that's not true? But then we would be required to get into the LDS doctrine and for you to show that he wasn't the only person, right? No, Your Honor. We'd have to apply common law issues, again, under neutral— Unless the Constitution says otherwise, right? No, Your Honor. We would have to apply neutral principles of common agency law as to if somebody is holding themselves out as a representative of an organization, as a bishop and a president, and a statement made by the Church to the Church's publication, to say after the fact, to Monday morning quarterback, and state, no, that wasn't a statement on behalf of the Church because the LDS's official spokesperson is not President Hinckley, would open up the door for every religious organization, including in Rashid. It wasn't just Pastor Rashid who made the statement. It was Pastor Rashid's colleague who was not the pastor, was just a minister, the same way that Presiding Bishop Burton is not the president. But everybody would be exculpated if they could say, well, other than the ultimate be-all and end-all, top-of-the-pyramid person, everybody else isn't speaking for the Church. That would be inconsistent. Well, would it? Because in this case, if you're looking at LDS doctrine, the answer to that question is absolutely yes, he is the only person. And it's not agency law. It's religious law. And I don't understand how you can determine by applying common agency law to what LDS doctrine is. And if you're trying to get into LDS doctrine, it seems to me that the First Amendment bars us to consider it. Isn't that right? And respectfully, no, Your Honor. If you look at the record here, the representations that were made, starting with President Hinckley, where it may have been qualified, but continuing. It was qualified in your counsel. I mean, your client apparently recognized that. He understood it. He heard it. He saw that President Hinckley was saying you've got tithing and you've got basically reserve earnings, and from the earnings of entities owned by the Church. The Church has shown by the record, as I understand it, that that's all that was being used to do the city development, City Creek. That is the Church's position, Mr. Huntsman's declaration. Isn't that what the record shows? No, Mr. Huntsman's declaration, if we look at the record at page 44 to 45, he doesn't differentiate. He just took President Hinckley at his word. And if we look at the qualification of Mr. Hinckley, meaning not his qualifications to be the President, but the qualifications of his statement. Okay. If he took him at his word, then you take the first statement, then he would understand what President Hinckley was talking about, right? The issue here, Your Honor, is we can take that. We don't have to, if the Court is so inclined not to look at the subsequent four statements, if to take Your Honor's position, as I understand it, that President Hinckley is the be-all and end-all. And we just look at his statement, and we look at how his statement has been explained in the record as he was referring purely to principle. That does not change the ultimate disposition of this case. Who said that he was just referring to principle in the first talk? I'm sorry, Your Honor? Who says that President Hinckley in his first remarks was just referring to principle? The Church, Your Honor. The Church says that? The Church has differentiated in their papers between the principle donations made by members.  And the interest generated by the investment of their constituents. And that's exactly what I'm saying. President Hinckley made that clear. Counsel, I want to ask a question on a different matter. I guess, what's your best case to support that there was a misrepresentation here? Or that there was a factual dispute regarding the misrepresentation? Especially given that the Church told its members that it would fund the mall with earnings on invested reserves. It appears that that's what occurred. So I wanted to give you a chance to address that. Respectfully, Your Honor, we disagree that the record shows that's what occurred. What we have in the record is the Church's testimony. And again, let's take, so we're not delving into meanings, let's take President Hinckley's after-the-fact explanation in the record as to what he meant, principle. Let's look aside for a moment for the issue of interest. Let's just look at the principle. We have sworn testimony from David Nielsen stating, and this is in the record at pages 80 through 82, stating that principal tithing funds were used to fund City Creek Mall, and that beyond that, principal tithing funds were also commingled with the earnings on the principal. However, he's clear that even without looking at the commingling, principal tithing funds, and that goes, and this goes to Judge Smith's question as well. It has to do, and this is my second point, with inferences. We are on summary judgment. And despite all the First Amendment and Fourteenth Amendment and constitutional issues, if we really look at what we're talking about here in the posture of this case, which is what's on appeal, we are at summary judgment. And on summary judgment, all of Mr. Huntsman's evidence must be taken as true and all reasonable inferences must be drawn in favor of the court. Sotomayor, I'm sorry to interrupt you. Before you run out of time altogether, I want to give you a chance to address the diversity jurisdiction, because my concern is I'm not sure on this record without further factual findings by this Court, which wouldn't be appropriate that there's enough to determine his domicile. As you know, the burden is on Mr. Huntsman to demonstrate diversity jurisdiction. He moved to California shortly before the lawsuit was filed. But his company had a filing with the State of California that has the Utah address. So to figure out domicile involves an evaluation of a lot of facts, and a lot of them doesn't appear to be on the record. I appreciate that, Your Honor. And if I may respectfully put a pin in my answer, I will come back in about 45 seconds to the inferences. I have a follow-up for you as well. Fantastic, Your Honor. To Judge Wynn's question, if we look, as you've recognized in the record, at 213 and 214, what we know, which in and of itself is a far cry from the facts of Lou v. Moss, we know that Mr. Huntsman moved his family to California in October of 2020. We know this case was filed in March of 2021. We know Mr. Huntsman moved to California to be closer to his business, which is located notwithstanding where it may be registered, but it's located, his office is in California. We know Mr. Huntsman came here for, he wanted to be closer to the ocean, he said too. And we know that at the time that the case was filed, there's no indication, unlike in Lou v. Moss, that Mr. Huntsman had any intention to be anywhere else. And if we look at the circuit's decision in Mondragon v. Capital One Auto Finance, this circuit contemplated, without applying it there because the facts were different, that a party, that a court may treat a party's residence as a presumption of domicile. In fact, other circuits... Actually, under Lou v. Moss, the presumption is in favor of his established domicile, which is Utah. So I'm trying to figure out whether he overcame that presumption with what's currently in the record. He obviously has the ability to have homes in a lot of different places. And the, I know his business, Blue Fox Entertainment, had a California address, but the filing actually listed his personal address as a Utah address. So there's just a lot of, given the timing of it, my concern is that the presumption should have been triggered, and the district court, we would have benefited from findings by the district court. But neither party really raised this issue below, and the district court didn't sua sponte examine this issue. And we agree, Your Honor. While, of course, the court could sua sponte address it, it was never challenged by the court. Therefore, there was never any response by Mr. Huntsman. And until this panel had raised the issue, it's never been in dispute. That said, we would welcome, if there's concerns by this panel that necessitate a remand to the district court on the limited issue of domicile, we'd welcome the opportunity to clarify the record, put in the evidence, either through declarations or documents or depositions on that issue. That would not be a problem. And so it is a resolvable issue, either through the presumption based on what's in the record already, which, again, is not like Louie Moss, where the person was living in hotels in the challenged domicile at the time. This is Mr. Huntsman was living in California, had his family here, moved here. I see a question.  Sorry. Thank you, counsel. Do you have a position on whether or not the Church autonomy doctrine is jurisdictional or not? I mean, it's an important question, because whether or not we could skip right to the fraud analysis, or do we have to address this question of the First Amendment? Your Honor, it is jurisdictional insofar as conceptually a Article III court cannot — I don't — I'm not aware. Maybe there is a case that states it in terms of specific jurisdiction. But conceptually, yes. Watson does say jurisdiction, but that was, like, over 100 years ago, so I'm just wondering if that —  And recently — conceptually, perhaps yes, insofar as if a church has to delve into issues of doctrine, the church cannot do so. But to address the issue here, it would be — it's a moot point, because our position is — again, not our position, but the position of every judge that's looked at it so far — That's a lie. — is that this is secular. And again, it just gets back to — Can I ask you, just on this point, one question one would have, looking at the lawsuit, is whether, if this lawsuit is allowed, will it invite a flood of lawsuits by people who become disillusioned with their religion? Because many people are religious or belong to a religious organization and then decide that it's not for them. And in this case, the speech that we're speaking of is really more of a sermon. And are we going to — if this case goes forward, are we going to have situations in which lots of people are suing their church or their synagogue or something else, asking us to resolve claims of a religious nature? Your Honor, I see my time, once we take into account rebuttal, has run. And I would like to have time to respond to Mr. Clement. I'd be happy to answer your question, but I just wanted to know. But you should go ahead and answer Judge Fletcher's question.  So the answer to the question is no. The precedent set here is very, very limited. If we find — and again, this goes to the slippery slope. And in fact, if we just say, had Judge Fletcher's prior opinion not been vacated, it would have had no impact whatsoever on how the church or any other religious organization practices its religion. The only precedent set by that opinion, now vacated, or by this Court's opinion, if it's reinstated, is that a church in this circuit cannot lie about how it intends to spend the donations of its congregants. And so if that's the precedent that's set, we would submit that's a proper precedent. It's not inconsistent with doctrine. It doesn't revolve — it doesn't require an analysis of doctrine. It is secular, the same way it was secular in Rashid, the same way it was secular in every case thus far that's looked at the issue of fraud, not employment decisions. Your Honors, I'd like to reserve —  Just very quickly, in conclusion, tithing is a religious practice. Fraud is not. To hold otherwise would open up the floodgates to a litany of serious civil torts no longer being punishable. Thank you, Your Honors. I respectfully reserve my time. Good afternoon, Your Honors, and may it please the Court, Paul Clement for the appellees. There are at least two fundamental problems with the fraud claimed by a former church member against his church here. First, there's no misrepresentation. The leader of the church explained that financing for a particular project would come from two buckets of church money and not from a third. And that is exactly what happened. Second, and even more fundamentally, this kind of tithing refund claim is barred by the church autonomy doctrine of the First Amendment. This case ultimately boils down to the question of what a church leader meant and what a church member understood when the former talked about tithing funds in contradistinction to earnings on invested reserve funds. Counsel, can I ask you something? Because you had briefed and argued this case as first and foremost, no trial will question a fact, summary judgment should have been granted, and secondarily, the First Amendment. But I would have thought that given the church autonomy doctrine that the arguments would go the other way in terms of the order. So I'm curious to see what your response is as to, you know, why the defense has set up the arguments that way. And secondarily, assuming that the church autonomy doctrine doesn't stand in the way of reaching the summary judgment issue, there is still the declaration of Mr. Nielsen indicating that funds were commingled. So two questions here. Let me try to answer them in turn. You know, look, I think it's a challenge for a church when they feel they are falsely accused of fraud in the context of the church leader speaking to the flock. It's a bit of a conundrum. Do you try to essentially clear the church's name by saying there's absolutely no misrepresentation here, even if this were a completely secular case, there'd be no there there, or do you say instead this is the religious autonomy doctrine, the church autonomy doctrine? I think in fairness, the church was so convinced that there is just no there here that it essentially wanted to clear its name and say, look, the easiest way to decide this case is to decide that there's absolutely no misrepresentation here at all. That's where I figured the answer was. But now then on summary judgment, if you want us to go there first, there is the declaration saying that the funds were commingled. So why doesn't that create a triable question of fact for the jury? It absolutely doesn't, Your Honor, because the fact that the funds may have been commingled for some purposes makes absolutely no difference under the secular law or under the church understanding of what President and Prophet Hinckley said. I mean, it may well be that the people that worked at Ensign Peak looked at all the funds under their management, which at some broad level, like all church funds, probably came from the faithful. The fact that they looked at all of those funds as in some sense sacred, as some sense the widows might, as some— Maybe I'm misunderstanding something because I thought President Hinckley's statement was that no tithing funds would be used but that earnings from reserves would be. But in a commingling situation, then there may be an issue as to how that's teased apart. But here's the thing, Your Honor. I mean, you know, they may have been commingled for purposes of making an investment, but there was very careful recordkeeping. They were not commingled for accounting purposes. And what the record here reflects in an irrefutable way is that the funds for this project that started out with $1.2 billion on January 1, 2004, and then were segregated from all other funds, that $1.2 million came from earnings on investment returns exclusively. And that is the unrebutted testimony, unrefuted testimony of Mr. Writing, and that's in his declaration in paragraph 14, and that's in excerpts of the record 538. So everything that was used for... I just want to follow up on this because it seems that Mr. Huntsman is arguing that the Church was fraudulently misleading because it did not speak with sufficient clarity about how it would use the tithes, these tithes. And so I'm just trying to figure out why is he wrong given that the 1991 and 1995 statements that are in the record point to several years removed and are not referenced within the 2003 statement? So, I mean, two things, Your Honor. First, to the extent we're saying, as Judge Fletcher did for the now vacated opinion, that the problem here is that the head of the Church didn't speak with sufficient precision when addressing the faithful about tithing, I think that's why this is a First Amendment problem. But I don't actually think in the president and prophet's defense. I actually think in 2003, even if you look at that document in isolation, he spoke with sufficient precision because he is in a way that some of the ensign peak employees at a later time are not. He's talking about three different buckets of money and he is distinguishing among and between those three buckets. And he says, okay, the Church has some earnings from commercial ventures and that corresponds to the fact that there was $150 million from an entity called PRI that's the Church's sort of real estate arm that's used as some of the seed money for this. So he talks about that bucket. Then he talks about another bucket that's distinct, which is, and I want to quote him directly, the earnings on invested reserve funds. And then he talks about a third bucket, which is tithing. Now, in a context where you're talking about those three buckets, I think it is clear even without the 91 statement, even without the 95 statement, that those earnings on invested reserve funds are different from tithing, which is in the context of that distinction more of the ongoing annual tithing of the faithful. And the only sort of contradiction here is the testimony in the Nielsen Declaration, which is all of three pages long, so I invite you to read it. It is not particularly damning. But he says, well, when they were working at Ensign Peak, they talked about all their funds, which included current year tithing funds and earnings on invested reserve funds. They talked about all of them as tithing. Counsel, I would like to essentially piggyback on Judge Bumatea's question about the First Amendment abstention doctrine. I understand your argument to have been that if we were to agree with the district court in the sense in the now vacated three-judge opinion's reasoning on the merits of the fraud claim, that there was no need to abstain, but that it's only when you don't agree that you start to get into church doctrine and then there is a need to abstain. As a matter of abstention doctrine versus the pragmatic concern you mentioned before, is that still your position that that is doctrinally correct? So I don't think we – I'm not aware that we took a position on that before. Let me tell you what my position is. What is your position now? And this is just my effort to be helpful to the court. I mean, you know, it might be tempting for me to say, yeah, it's jurisdictional and we really would love you to decide the First Amendment question right now, but I don't think that's right. And I think there was a lot of confusion in the courts before Hosanna-Tabor, but in footnote four of Hosanna-Tabor, the Supreme Court clearly labels the ministerial exception as an affirmative defense. And then a few years later in Our Lady of Guadalupe, they say that the ministerial exception is just a subspecies of the church autonomy doctrine. So I think if you put the Supreme Court's two latest pronouncements on this question together, you are left with the inescapable conclusion that this is not jurisdictional. It is an affirmative defense. And that has – I should just add parenthetically, that is the virtue of courts being coherent and true. There's nothing about Article III about the church abstention doctrine. Can I just change the focus a little bit? The church primarily defends itself on secular grounds on the basis that it was very clear what President Hinckley said at the beginning. When you look at what he said, when you look at what the accounting record showed, and the fact that the former employee of Enz and Peak wasn't there when this allegedly occurred, it doesn't really matter what the employees said. They weren't the prophet. What I don't understand is why the definition of tithing funds, by definition, doesn't run into a First Amendment problem. If the First Amendment basically eclipses this, we don't even get into summary judgment issue. We never get to it at all. Why did the church take the position that this was just secular? So I don't think the church ever took the position this was secular. Not just my reading. Right. No, I think they took the position that there was no misrepresentation here at all. And as I alluded to, I mean, I think that's actually an understandable temptation for any church when it's accused of fraud or misconduct because obviously it's important to the church to be, you know, above board, holier than thou, whatever phrase you want. And so there's just this temptation to say we did nothing wrong. Now, I think ultimately— I get that. I get that. I'm just saying, since we're dealing with your colleague over there, he's saying, hey, look, this is just a sort. Is it tort? We think it's all secular. You seem to say it's secular. It all comes down to who said what, when, and where. It's a material issue of fact. But if you have a focus on what the tithing means, then you run into the religious protection issue, which you never get to the other one. Help me with that, please. I'm happy to help you. I guess what I would say is, you know, I think ultimately the temptation that this church or any church has to defend itself as if it were a secular entity is maybe, upon reflection, the best reason to apply the religious autonomy doctrine at the threshold and just say we're not going to put churches in this position because we're going to make it crystal clear that when a member or former member of the church sues for a tithing refund absent unusual circumstances— and I think there probably are exceptions for embezzlement or cases that would be different, where it's not general tithing but it's a specific representation for a particular purpose and then the funds are diverted. There's nothing in this case, if I understand correctly, nobody's claimed that the church had a Ponzi scheme. Nobody claimed that some person enriched themselves or provided jewels and so on for somebody. This is strictly an issue of the president of the church who, by all the yes people, is the person, the authorized person says what it meant. It didn't change. Mr. Huntsman apparently read that, understood that, if I gather. He's taken these later four statements. He says, well, that's confusing. Well, it's not him to decide, right? Otherwise, you have laypeople deciding what the doctrine of the church is. And that, to me, gets back to the church autonomy doctrine, which maybe should be governing this case. I don't disagree. I think the church autonomy doctrine squarely covers this case. In my opening, I was going to give you two sentences on where there was no misrepresentation, and then I was planning to talk to you about the church autonomy doctrine for the balance of the time. So if we were to go with the church autonomy doctrine and rationale, it sounds like you were starting to say that there would be still some cases that could be brought, and I'd like to hear more about that, like a hypothetical where there's been some tragedy, there's a fire in the next town, and now you've got orphans because their parents were killed in the fire, and the church says we're collecting for these kids, everything in this basket will go to the kids, and then they spend the money on new clothes for the minister. Is that a case that could still be brought under your doctrine? Under my view, that is a case that can still be brought, and essentially doubly so, because the way I would sort of think about this area of the law is you start with the presumption that the religious autonomy doctrine applies, but there are exceptions. The two exceptions that I think have been recognized by the courts over the years is one, call it embezzlement, just call it, you know, whatever it is ends up in the church leader's pocket. And then the second situation, which I think is different, and I think you could allow the claims to proceed without running afoul of the doctrine, is where it's not general tithing, it is a specific solicitation for a specific purpose, and then the funds are diverted. And I think that that latter case is different largely because a whole second problem, and I believe Judge Bress alluded to this in one of his questions, but a whole separate problem under the church autonomy doctrine with this claim is with the reliance element. Because when it's tithing, from the church's perspective and from the perspective of a faithful adherent, that is a commandment, that is a scriptural commandment to give 10 percent of your earnings or your increase or your income that is really wholly independent of what the church does with it. And that's not the case, obviously, when it's a solicitation for everything in this basket is going to go to hurricane relief in a particular place. Are there limits to that, though? So say it's a Catholic church that has always said we're against abortion and they collect tithes, and then they say we would, of course, never support abortion, and then they collect a bunch of money and they pay for abortions with it. Could you sue? I don't think you could. I think that's a hard case. It's a hard hypothetical. I understand it. But I think in that kind of general tithing thing, you know, you might be able to leave the church over it, but I don't think you can get a refund under those circumstances. And why not? That's because there's some religious ambiguity about what abortion means? Or what would be the reason? Well, I mean, think of it this way. I mean, one reason might be that the church might change its doctrine on the issue, and you'd still have these refund claims. And I think if you go down that route, you know, all of a sudden, I mean, you know, in the secular context, the SEC has developed a safe harbor for forward-looking statements. And I just hate for this court to have to impose that on religious leaders when they talk to their flock. And that's exactly what this is. This statement 2003 is a forward-looking statement. It says no tithing funds will be used for this purpose. Now, it turns out that under President and Prophet Hinckley's definition, that's exactly what happened. But if that changed for some reason, would that be a basis for somebody to get a refund? Would it be a basis for the courts to be, even in the hard hypothetical you gave me, you'd still have this problem of the Catholic parishioner coming in and saying, well, I would have never given my money if I knew that was going to happen. And then the church would be saying, well, that's not right. You actually, as an adherent Catholic, you have an obligation, a commandment to give tithing as well. And so there's a jury question over whether or not there was actual or reasonable reliance in this case. I suppose if you were really going to adjudicate this, you could have one side bring in an expert on Catholic church doctrine. You could have another side bring in an expert on actual practice of Catholics when it came to the collection basket. And then you throw it all to the jury. I think that's a pretty good explanation for why the church autonomy doctrine would apply, even in that hard hypo. Could I ask you a question about commingling? And I don't know if this is the church's position, but if the funds from tithing went into Ensign's bank account and then the earnings were accrued in that, and so it's commingled. But if the church establishes that the earnings themselves far exceeded the investment that would go into the City Creek project, is that the church's position as to why there's no misstatement? Because even if there's a commingling of the funds, the earnings themselves are more than sufficient to cover the cost of the investments, and therefore that's why President Hinckley did not misstate anything. Is that the church's position? Well, if those were the facts, I think that would be the church's position. But the facts are even better for the church because, you know, there was not commingling for accounting purposes. And, indeed, after January 1, 2004, the record clearly shows that money was set aside for this project. $1.2 billion was set aside specifically for this project, and then that was always treated separately. There's an account that shows every withdrawal from that account. It shows that that was basically drew down on until March of 2012, where at the end there was still $151 million in there. And then we have testimony from writing. That's paragraph 15 that I've already alluded to that says that that $1.2 billion came exclusively from earnings on reserve funds. So under this record, I don't have to, you know, and this is something else that you'd get into if you got to the reliance element. I mean, at a certain point, money is fungible. And so if the church hadn't been as careful in its accounting, I think I would still be up here saying, like, what are we talking about? That, you know, in year 2003 alone, the church had earnings on reserve funds that were well in advance on anything they spent on this project. And so there's just no issue that, like, they had to go into for years tithing. Is it your view that the Nielsen Declaration does not create a genuine issue? Because even if Ensign used shorthand to say it's all tithing, that doesn't make it so. It's what the church is saying that is what's important for purposes of this distinction between earnings versus the principle. Absolutely. And Judge Smith was alluding to that earlier. But, you know, there's only one person that can speak authoritatively for the church on the meaning of tithing, and that is the President and the Prophet Hinckley. And so if other people in the church are using loose language, that is just irrelevant as a legal matter. I just have to add, though, like, even in a secular setting, I can imagine the same thing, because President Hinckley is being very specific about three buckets. And in that context, he describes one of the three buckets as tithing. If somebody else in another context is not differentiating between three buckets and is just talking about one bucket and describes it as tithing, I mean, you know, look, try to find, like, a simple secular example, but, you know, there's blueberries and then there are blueberries. You know, not all berries that are blue are blueberries. And so if somebody is talking about that in one context and they very specifically distinguish between blueberries and black raspberries and blue raspberries, well, then you'd understand it one way. And if somebody else is saying, oh, they're all blueberries, like, you wouldn't think that was a fraud claim. And at some level, that's all that we have here. Can you explain why we're carving out embezzlement from the church autonomy doctrine? It seems like it would be the same interest. Are you saying there's a text and history of that or something of that nature? So when the courts have come up with something that is, you know, that egregiously self-dealing, and that's really this court's decision in Rashid, I think what the courts have done has had they, you know, maybe call it a cheat, but what they've done is they've said there's a sincerity problem. Right. And that's the way they've sort of been carving out embezzlement, though. It comes to the same thing at the end of the day, and not every court has gone the sincerity route. But that's the way I think the courts have mostly approached that. I also think that, you know, the reason maybe they're sort of joined at the hip is at a certain point, you know, the reliance question I think becomes more straightforward when very few people are actually going to give money to the church if they just think it's going to be embezzled. So you said you were going to start. I'm sorry. You said you were going to start out by saying there was no misrepresentation here and then go into the church autonomy doctrine. Are you suggesting that is the way we can resolve this is just say there's no misrepresentation and end it there? That is a way you could resolve this case, and you could say not one word about the religious autonomy doctrine, and I would be happy to win this case for my client on that ground alone. Can you talk about the – oh, sorry. Go ahead, Judge Freeland. Could I just go back to – so the hypo, I think you said there were two things. So there's the fire, and you've got kids who have no parents, and they say this basket of money is going to go to those kids. Let's get rid of the clothes for the priest and say instead they spend it just on a hurricane somewhere else. Is that a claim? I think that's a claim because I think that's a distinguishable situation where it's a solicitation for a particular reason, and if those funds are diverted to something else, I think that's a different – I think that's a claim that you could bring, and I don't think – Not just embezzlement. No, no. It's broader. Right. I took the question to be in some respects it's harder to explain the embezzlement exception than it is the specific solicitation diversion. At least I find it harder to explain the embezzlement exemption, but it's there in the cases, and I do think, as I say, whether you call it a little bit of a cheat or you just understand it as a unique situation where there's just no real practical difficulty in proving reliance. And in this case, there is no allegation, I gather, of a specific request to use tithing for this specific fund. That's the church's position, right? That is the church's position, and one of the things that makes this case so extraordinary, of course, I mean, we're so far away from these other examples because the church was completely forthright that it was going to use church money for this particular purpose, and then the president added, I suppose, gratuitously and maybe unfortunately in hindsight, all right, but I'm going to be clear, there's three buckets of church money that we could use, and we're only going to use two buckets. We're not going to use the third bucket for this purpose. Well, in this case where if the church takes the position, he's the president of the church, the prophet, and church members are asked to contribute tithing based on worthiness. They only get to go to the temple if they do that. They're supposed to get certain blessings. There's never any discussion about how it's going to be used in church doctrine. So if you have that situation and you get back to what was actually said by President Hinckley, you don't have the example that you gave where they said, we'd like you to contribute some money for this, and we're going to use it for this, which is contrary to the normal doctrine, and that answers, I think, my colleague's question. If there's a specific request to use money for X and they don't use it for X, that might be different, but that's not the way tithing is solicited, is it? Well, yes, and tithing really isn't solicited in the same way as limited purpose funds are, which is why in describing sort of the meets and bounds of the doctrine, I would describe it as tithing refund claims are presumptively covered by the church autonomy doctrine, subject to these two exceptions, and I think that would provide a clear rule, and it would have the incidental benefit of avoiding churches from being in the dilemma that my clients were in, which is they don't want to just rely on an immunity. They want to, you know, they've been accused of wrongdoing, and they want to defend themselves. But if you make it crystal clear that there's, you know, a broad doctrine with two exceptions, then I think that it's much easier for churches in future cases to say, we're going to get rid of these cases at the threshold, and it also prevents the, you know, opening of floodgates. And Judge Bress asked a question about this as if it were a hypothetical. But since this panel decision, there have been multiple class actions brought against the church, and I don't think it is a problem that is limited to my client. Other churches are here as amici because they're worried about this same thing, and I think the reason they're worried about it is every church has adherents that then lose their faith. Now, if those adherents, former adherents, came into court and said, well, I want all my money back because, you know, for years I was told I needed to give this money to save my immortal soul, and now I've decided all that immortal soul stuff is bunk. There's no afterlife. This is it. I want that money back. I'm going to Vegas, whatever. Like, if they tried to bring that claim, they would be laughed out of court. Of course you can't bring that kind of fraud claim where you bring in experts and say all this afterlife stuff is bunk. But there's a profound temptation in that circumstance to, you know, go back and flyspeck all of the sermons and say, oh, well, you know, I was told something about abortion or I was told something about this City Creek project. And, well, you know, in retrospect, I wouldn't have given my money. So I want to do a secular fraud claim instead of the obviously improper religious fraud claim. I think there are good reasons to stop that at the threshold. Sorry to interrupt you because I know your time is running short. Can you spend a minute addressing the jurisdictional issue? Because it seems apparent to me that the church's counsel were aware, and just the way that they questioned Mr. Huntsman during his deposition had flagged this issue for themselves, but then it just kind of, like, petered out. Is there a reason for that? Is there a downside to remanding for additional factual findings by the district court before we take up the merits of the case? So, I mean, you know, if this Court can, you know, instantly reconvene the en banc panel after it sends it back to clarify what I think is true and have no reason to doubt, I mean, I don't really, you know, I barely have standing to object to that. I mean, I think if the consequences of that were that we had to go back to square one or something, you know, I think it was not the best use of this Court's resources. I guess, you know, to answer the question, we asked some questions in the deposition. The answers were such that combined with the averments in the complaint, we didn't think we had a basis to question his domicile at the point that he filed the complaint. I mean, he alleges he's a California resident, which I know there's kind of these competing presumptions, the presumption in favor of the old sort of domicile, but there's also a presumption in favor of residents being the domicile. As my friend on the other side says, you know, we're miles away from a situation where the only new domicile is a hotel room. And then you add to that the fact that there was a specific allegation that there's complete diversity in the citizenships of the parties, which was a separate allegation in the complaint. I think we took all of that, everything we heard in the deposition. We did not think we had a good faith basis to question what is, you know, this is, you know, it's a weird situation in a sense because the question is ultimately, I mean, although testimony intent is not dispositive, the legal question is ultimately the intent of the person at the point at which they filed the complaint, and we don't think we have any basis to question that. And I would say maybe this is another reason why the church autonomy doctrine should apply. But, you know, it puts a church in a weird position where it has to call its former member a liar, you know, at the jurisdictional threshold, which is essentially what we would have had to do if we doubted his affirmance in his testimony. Counsel, can I ask a question? What are we to do with Watson, which did call it jurisdictional? I know that wasn't a constitutional case, but it does seem relevant to how we look at this now. So, you know, the Supreme Court multiple times since Watson has said that jurisdiction is a term of many meanings, too many meanings. Right. And so I think when you put that more recent observation of the court together with what it said in Hosanna Tabor and what they then subsequently said in Our Lady, I think as a lower court, you do not have to tie yourself to the mast of what the court said in Watson. I think you are free looking at the Supreme Court's decision. That footnote could also be considered dicta, don't you think? What's that? That footnote in Hosanna Tabor could be also considered footnote. I have read theories that that is dictum. I would take my chances with saying that's a holding and think that's a safer course than saying we're bound by Watson as the holding. So, Counsel, in this case, if we were to resolve it over what I'll call the first ground, which is the nonconstitutional ground, that would be solely a question really of California law, correct? You agree with that? I would agree with that. So there are a lot of other states in the country, and I'm curious would there be other states that define fraud differently that would then, in a sense, bring this case right back to us if it was brought in Nevada or brought in Idaho or Utah? Or do you not see a difference? I don't see a material difference. I mean, there's probably some state out there that has a funky concept of fraud by omission, but I think you really don't get a fraud claim anywhere without a misrepresentation. Does the Church have any sense of how many copycat cases were filed against it as a result of the original panel's decision? Well, there's been at least half a dozen, but most of those have been styled as putative class actions, and there's sufficient litigation against them that an MDL has been convened. So that's why I say the floodgates concern here is not hypothetical. It is real, and it's all since the panel's decision in this case. Are they all California cases, or do they vary? They're brought in multiple jurisdictions. Let me just, like, close with one point of context here. I mean, you know, among the problems with this claim is not just that you can't decide it without deciding the definition of tithing, but you can't really decide it without saying that the supreme leader, the supreme religious prophet of a religion with 17 million adherents basically committed a massive fraud on his followers when he was speaking ex cathedra. Now, I don't think that proposition alone decides the case for the reasons I alluded to and the exceptions, but it sure contextualizes the case and sure makes clear that the autonomy doctrine should apply. Thank you. Thank you very much. Your Honor, I'd like to make three brief points on rebuttal. First of all, with respect to Judge Wynn and Judge Smith's question on characterizing the First Amendment as really the fallback argument here, that's precisely right. What's strange about the posture here is that the Church put its financials on the table. This is not a situation where the Church said we're called out for our financials, we're not giving them to you because it's First Amendment protected. The Church went ahead and put its financials on the table and characterized them a certain way. And it was only when Mr. Huntsman, again, who inferences must be drawn in favor of, put his own contrary declaration on the table and said no, tithing principal funds were, in fact, used, that all of a sudden the Church said, oh, this is a constitutional First Amendment issue up front and center. It was after the prior vacated decision recognized the triable issue. So it's patently unfair we'd submit for the Church to put their financials, and then when those financials are questioned, which, again, is a secular issue. It's anybody with an accounting degree, any high school student, even an elementary student who takes economics or anything, simple math. Let's count up what's in this pile, let's count up what's in this pile, and let's see if that's consistent with what we submit as a secular statement by President Hinckley about which pile was used. That's a secular issue that can create a triable issue under the summary judgment. And on that one, are you saying commingling is combining the piles? Because the Nielsen talks about commingling as I read it, and I'm not sure you have evidence that there really were two piles and they took from both. You just have one pile together, right? No, Your Honor. If we look at the actual documents, and again, this is what's strange about the case. The Church keeps saying the documents show, the documents show. The documents don't even mention the word tithing or tithe once. The documents are questionable, and if the case moves forward, there can be discovery and follow-up questions concerning those documents. We thought it was sufficient for the purpose of summary judgment that a sworn testimony of somebody who has percipient knowledge, having worked for the Church's financial arm, would at least create a triable issue. But there are numerous follow-up questions, not about the Church's business decisions or about how they're conducting things, but simply, these are financials. Why don't they say tithing? Why don't they differentiate between principle and interest? As the Church said, these are accounting issues that you wouldn't need a doctrine expert, you would need a CPA to resolve. And to say that this is a First Amendment issue or even that there's no triable issue of fact at this juncture, when inferences need to be drawn in favor of Mr. Nielsen and not the Church and Mr. Writing, would be to prematurely decide this case for the wrong reasons. Finally, with respect to Judge Friedland's hypothetical, your hypothetical about you're raising money for orphans and instead you're spending it for something else. And my colleague says, no, that case wouldn't be precluded by a decision in the Church's favor here. To the contrary, it would, because if it's okay here for the Church to say where the money is not going to go and to do it dishonestly, then it's fine for somebody to say where the money will go and to do it dishonestly. It's two sides of the same coin. Doesn't it turn on the baseline obligation? I mean, here the obligation is to pay money as a religious commandment. In these other hypotheticals, it's sort of like a conditional donation. I'm giving this money for this particular purpose. Don't you think there's a distinction between the two? No, Your Honor, because the Church in this instance set its own secular condition on the money. The Church said on five separate occasions the money will not be used, including not one penny of this pile will be used to fund City Creek, and Mr. Huntsman relied on that. And if it turns out from the documents that even one penny was used, it was a misrepresentation not under the First Amendment, not under the Fourteenth Amendment, not under the Church autonomy doctrine, under California neutral principles of law. Counsel, on the question of the accounting, my understanding for your to create a disputed material fact, you're relying completely on the Nielsen Declaration and regarding the seed money for EPA. As far as I could tell, the entirety of his declaration was that, according to what senior leadership of EPA informed me in 1997, EPA was born and was seeded with tithing money. Is there anything else in the record specifically that you're relying on to create a genuine disputed material fact regarding the source of the seeding money? Your Honor, frankly, it wouldn't be possible for there to be something else in the record at this juncture because there's been no ability. If we remember the posture, this was remarkably ordered to summary judgment a few months into the case at what was supposed to be a conference to discuss a discovery calendar and a trial date. None of that was done. All there was was a single deposition of Mr. Huntsman, and there was a declaration from Mr. Nielsen. And if this case moves forward, which it should, there will be an opportunity to flesh that out. But to say that because the Church is able to put in, again, documents that we submit don't really stand for much other than how the Court chooses to characterize them, but we can't then follow up and ask what they actually stand for consistently with Mr. Nielsen's declaration, again, on personal knowledge, as you just read, would be, again, to cut the legs of this case off prematurely. Can I ask, why doesn't sincerity fix the problem of Judge Friedland's hypothetical? It does, Your Honor. And if we look, again, at the sincerity doctrine here, which notably the first time it's been raised is here at oral argument. The Church hasn't had a response to that point in any of its briefs. And that's because the point swings in Mr. Huntsman's favor. The issue of sincerity, again, as was held in Puri and in Rashid, is if you say this is a commandment of God, we're going to do it this way, and you knew at the time that you said it, just like in Puri, it wasn't coming from investments that were making money because God blessed them. The money was coming just from other members, other ministers. Just like here, the money wasn't, at the time these statements were made, the money wasn't coming, at least according to Mr. Nielsen, from earnings on tithing funds. It was coming from principles. So under the sincerity doctrine, President Hinckley knew, we submit, at the time that he said it, that what he was representing was not true on behalf of the Church. And that falls outside of the sincerity doctrine because it's not a question of his belief. It's a question of the facts that he was aware of, separate and apart from what a doctrine of God may have dictated to him. These were facts. These were secular facts. And, Your Honor, thank you.  Thank you very much. Thank you, Mr. Janellis, and thank you, Mr. Clement, for the oral argument presentations here today. The case of James Huntsman v. The Corporation of the President of the Church of Christ of Latter-day Saints is now submitted, and we are adjourned. Thank you.
judges: MURGUIA, SMITH, NGUYEN, OWENS, FRIEDLAND, BRESS, BUMATAY, VANDYKE, SUNG, SANCHEZ, ALBA